## DECEMBER TERM, 1843.

### EDWARD BOISGERARD, *et al. v.* MICHAEL WALL.

Where the parties in interest are so numerous as to render it inconvenient, if not imprac-
ticable, to make them all defendants, without great delay and expense ; and justice can
be done between the parties before the court, without affecting the interest of the others ;
the court will proceed to a decree, notwithstanding the want of parties.

Where there were one hundred partners, who had each executed a mortgage to secure the
debts of the partnership, and some of the partners were dead, leaving numerous repre-
sentatives ; *held*, that the mortgagee might foreclose each mortgage, by a separate suit
against each partner, without making the others parties.

An unincorporated association of men, for the purposes of banking, is but a private part-
nership, and their contracts and liabilities are those of private partners.

Articles of partnership regulate the rights and powers of the partners, as among them-
selves, but as to third persons, they may be altered by the conduct of the partners, so
as to be contrary to, or beyond, their original terms.

Where, by the articles of a partnership association, for the purpose of private banking,
each partner was to execute a mortgage to the partnership, to secure the payment of
his stock in the partnership, and afterwards the mortgages were made, securing not
only the stock, but also the circulation and debts of a general character, of the partner-
ship ; *held*, that the mortgages were a security for the debts of the partnership, to
which a creditor, to whom the partnership had assigned the mortgages, might resort for
payment.

The interest of a mere mortgagee is in the nature of a *chose in action*, and cannot there-
fore be seized and sold under an execution at law.

Where debts due to a partnership, in five, ten, and fifteen years, had been secured by
mortgages, the creditors of the partnership could not have any more summary remedy
on the mortgages, than the partners themselves would have.

Where each partner executes a mortgage to the partnership, for the purpose of " *binding
and rendering himself liable to pay the* " partnership debts, and, in the condition of the
mortgage, recites that the mortgage is to be discharged when the *liabilities* of the part-
nership are *all* paid ; held, that one of the objects of the mortgage was to secure the
payments of the debts of the partnership.

THE bill states that Michael Wall, and more than a hundred
other persons, entered into articles of partnership in April, 1838,
for the purpose of banking, under the style of the Real Estate
Banking Company of Hinds County. · The names of the partners
are given, and the terms of the partnership.

That M. Wall subscribed for $239\frac{29}{100}$ shares of stock in the
association, and executed a bond to the president and directors
of the company for the sum of $23,929·29, to be defeated upon

the payment of one third thereof at the end of 5 years, from and after the first day of January, 1839 ; one third thereof at the end of 10 years, and the other third at the end of 15 years from said date, and upon meeting and satisfying any other call that might be made upon him by the said president and directors, in pursuance of the requirements of said articles of association.

And that, on the said 3d day of July, in the year 1838 — the day of the date of the bond — the said M. Wall, still further to secure the amount of the stock by him subscribed, punctually, and at the periods in said bond specified ; and to bind and render himself liable in conjunction with each and every of the stockholders of the said Real Estate Banking Company, to all and singular the holders of the notes, bills, checks, and other liabilities of the said Real Estate Banking Company of Hinds county, then existing, or which might exist, at any period during 15 years, from and after said first day of January, 1839 ; conveyed to said president and directors, by indenture of mortgage, certain lands lying in Hinds county, which was duly delivered, certified, and recorded, &c.

And that, at a meeting of the board of directors of said company, held at Clinton, in February, 1839, it was resolved, that Joseph Davenport and Jacob F. Foute, should be, and they were appointed commissioners to negotiate a loan in New Orleans, with power to sell, transfer, pledge, or hypothecate the stock, bonds, and mortgages of the company, as collateral security for the repayment. And that, on the 6th of March, in the year 1839, a letter of attorney, with full powers, was made to them accordingly. That an agreement was entered into with the complainant, Boisgerard, by them, on or about the 9th of March, 1839, for the loan or advance by him to said company of $300,000, in consideration that the company would execute and deliver to him their joint and several bond, in the penal sum of $600,000 ; conditioned for the payment of $300,000 with interest, at 7 per cent., and all proper costs and charges, on or before the first day of March, 1840, by shipments of cotton to Bonnaffe, Boisgerard, & Co. of Havre ; and would assign and deliver to complainant, John Delafield, as trustee, certain bonds and indentures of mortgage, mentioned in a schedule annexed to said articles of agreement, amounting to

$600,000 and upwards, with power and authority to him to collect the amounts due upon, and secured by the said bonds and the said indentures of mortgage, or to sell the said bonds and indentures of mortgage in case of need, and to apply the proceeds thereof to the payment of all or any sums of money due from the company to the complainant, Boisgerard. And that, between the date of said agreement and the 20th June, 1839, the said company should ship to Bonnaffe, Boisgerard, & Co. at Havre, 5000 bales of cotton, out of which complainant, Boisgerard, was to receive $100,000 towards the repayment of said $300,000. And that, in case the company failed to perform their agreement, that they should reimburse to the complainant, Boisgerard, the amount of his advances in 90 days, and that the date of such failure should be fixed by notice of John Delafield, and a copy addressed to the company.

That the money ($300,000) was advanced, the bond for $600,000 executed, and deed made in pursuance of the agreement, by which the president and directors of said company, for the consideration of one dollar, and for divers other good causes and considerations, granted, bargained, sold, assigned, transferred, and set over to complainant, John Delafield, all the said several indentures of mortgage in the said instrument specified, being those mentioned in the schedule annexed to the agreement, together with the bonds or writings obligatory, in the said indentures of mortgage described, and all moneys due, or to become due on the said bonds or writings obligatory, and said indentures of mortgage; constituting said Delafield the agent, to use all lawful means to collect said moneys, &c. That among the mortgages and bonds so sold and transferred, was that of Michael Wall. That Boisgerard complied with his agreement; the company did not comply with theirs, and that they owe him $305,988 and 56 cents, and interest since March, 1840; whereby M. Wall became, and was, and still is, liable and bound to complainant, Boisgerard, to pay the same.

The bill charges, that the whole amount of $23,929.20, mentioned in the condition of the said bond or writing obligatory, and the said indenture of mortgage executed by the said M. Wall, as aforesaid, and secured thereby, still remains due and unpaid, no part having been paid before the transfer, or since; by which the estate

has become absolute in law, in complainant, Delafield, as trustee for complainant, Boisgerard : and that said mortgaged premises are a slender and scanty security, and wholly inadequate for the payment of the said sum of $23,929·20, mentioned in the said indenture of mortgage, executed by the said Michael Wall ; as aforesaid, and that the whole property mentioned in all the said indentures of mortgage, conveyed and assigned to said Delafield, in trust for said Boisgerard, are wholly inadequate, and are a slender security for the payment of said $305,988 and 56 cents. And the bill states, that the complainants do not seek to bring in, as parties to the suit, the great body of stockholders in, and subscribers to, said company ; for the reason, that the great number of them, and the change of residence and death of many, would render it impossible to bring them all, and the heirs and representatives of such as have died, or may die during the pendency of the suit before the Court.

The bill prays that the said Michael Wall may be decreed to pay the said sum of 23,929·20, mentioned in the condition of the said bond or writing obligatory, and the said indenture of mortgage executed by him, or the said sum of $305,988·56 and interest : by a short day, &c., or in default, that he and those claiming under him, may be foreclosed of and from all equity of redemption in, and to said mortgaged premises, &c., and for general relief, &c. With the bill, as parts of it, exhibits are filed from A. to J., of the above facts.

Two points are taken on the demurrer.

1st. That all persons having a direct interest in the decree to be pronounced, are not made parties to the suit.

2d. That the debt secured by the mortgage was not one at the time of the filing of the bill, nor for more than a year thereafter.

*C. R. Clifton,* on behalf of the demurrer.

1st. By the bill and the articles of the partnership, filed as an exhibit, it appears, that more than one hundred persons became members of the Real Estate Banking Company of Hinds County, for the term of fifteen years, and that the conduct of the affairs of the company was to be intrusted to a president and board of di-

rectors, who should serve until the 1st Monday of March, 1839, on which day, and on each succeeding 1st Monday of March, during the existence of the company, there should be an annual election (see exhibit A, art. VI. and p. 3, 4 of bill), and that, on the 1st Monday of March, 1839, at a regular meeting of the stockholders, held pursuant to the provisions and requirements of said articles of association, certain persons (naming them) were duly elected directors for the ensuing year. Now, the general rule is, that you must have before the Court all parties, whose interests the decree will affect, because they are concerned to resist the demand, and to prevent their fund from being exhausted by collusion. The bond and mortgage here, were made by a member of the company, to the president and directors of the company, and thereby became the fund of the company. With other bonds and mortgages, to the amount of $600,000, they were transferred to the complainants, who allege, that they are a very inadequate security for their debt of $305,988·56. It is the interest of the *company* that these bonds and mortgages shall pay as much of their debt as practicable, because they are liable for whatever may remain unpaid out of their other assets. It is the interest of the *individual* mortgagors that they may bring as little as possible, that thereby they may reacquire their mortgaged estates, disincumbered of these mortgages, for the smallest possible sum. The *company* is, therefore, directly and deeply interested in the controversy, and ought to be made a party to it. In *Gifford* v. *Hart*, (1 Schoales & Lefroy, 386), it was held that a decree obtained without making those whose rights were affected parties, was fraudulent and void as to those parties. The same principle was declared in the House of Lords, in *Gore* v. *Stackpoole* (1 Dorr's Rep. 18), in which it was held, that to make a foreclosure of a mortgage valid, all parties in interest must be brought before the Court. I am aware, that the inconvenience of this rule has sometimes led to its relaxation, both in England and the United States ; but Mr. Justice Story (2 Eq. 741), alluding to the legal rule, says, it is of a far more extensive nature in equity, whose courts frequently require all persons who have remote and *future* interests, or who are directly affected by the decree, to be made parties ; and they will

not, he says (p. 742), if they are within the jurisdiction, and capable of being made parties, proceed to decide the cause without them. It is not alleged in the bill, and could not be, that a majority of these persons are not within the jurisdiction of the court, and capable of being made parties. That some are beyond the jurisdiction of the court, may be a sufficient reason for omitting them ; but it does not follow, because you may omit some, you may omit all.

If, however, the Chancellor should be of opinion, that, in a case like the present, all the members of the company need not be made parties, in consequence of the inconvenience and delay which might result from it (and it is conceded that some chancellors have gone that far), still it is believed, that no case can be found, where a bill has been entertained against one member of a joint stock company, which conducted its affairs by a president and directors, without, at least, making them parties, which is in effect making parties of all the company ; and there is an obvious propriety, not to say legal necessity, in this : the company makes its contracts through these agents and members, and they are proper parties to all suits, seeking an adjustment of their contracts. It was so held in a case referred to in a note to 15 Vesey, 14, and this seems to have been the opinion of the complainants, from the frame of their bill, as they have made parties of those persons who were directors at the time of their contract. They have shown by their bill (p. 3, 4), that according to the articles of association, there was to be an annual election of directors on the first Monday of March in each year, for fifteen years, the period for which the partnership was formed ; and that they made the contract therein set forth, with the directors, elected on the first Monday of March, 1839 ; and they bring their bill against these same persons, in the year 1842, without alleging their reëlection, or that no election has since taken place, or any other matter or thing which gives plausibility to the idea, that these same persons have any interest or concern, whatsoever, in this company, as directors. The amount they claim is large, very large, and the defendant M. Wall, as an individual member of the company, having no connection with its active business, can know nothing of its justness, nor whether the

payments made have been credited, nor whether the sums charged were received ; and certainly the persons having charge, as directors, of the books and business of the company, at the time of the bringing of the bill, and not those who were such in 1839, when the contract was made, are the proper and the only proper and necessary parties, and there is no averment in the bill to repel the necessary inference, that the affairs of the company are now in the hands of other and different persons. For these reasons, then, the demurrer is well taken, as to the first point.

2. The second point is, that the bill was brought before the debt secured by the mortgage became due.

The bond is for $23,929·20, and is dated the 3d day of July, 1838. The condition is for the payment of one third of that sum at the end of five years, from and after the 1st day of January, 1839, one third at the end of ten years, and the other third at the end of fifteen years from the date aforesaid ; and that the obligor should meet and satisfy any other call that may be made by the president and directors, in pursuance of the requirements of the articles of association.

The bond is for the amount of stock subscribed for by M. Wall. The articles of association require, that the stock shall be secured by bond and mortgage on unincumbered real estate. The mortgage is intended to secure the amount of the bond, and to render the mortgagor liable, with each and every stockholder, to all and singular the holders of the notes, bills, checks, and other liabilities of the company then existing, or which might thereafter exist for the period of fifteen years. This latter clause creates no additional liability on the part of the mortgagor ; he was, without it, liable for all the debts the company might contract. Before the agreement of the 9th of March, 1839, with the complainants, any creditor of the company might have filed a bill against the proper parties, and subjected this fund, or the mortgaged premises, to sale, for the satisfaction of his debt. By this agreement a special appropriation of this fund, or bond and mortgage, and the premises on which they reposed for security, was made, and any creditor seeking to reach it, would have been enjoined from doing so, at the instance of the present complainants ; seeing that the agreement thus appropriating

it (or deed) was matter of record in the county in which the land was situated. What was it that was thus specially appropriated to the complainants ? Was it the general liability of Michael Wall, as a member of the company, or was it the bond and mortgage, and the land on which they rested ? The nature of the case, as well as the contract of the parties, determine it to be the latter. The *general liability* is incapable of transfer or special appropriation, and is a resource alike open to every creditor, and incapable of extinguishment, as long as a debt of the company remains ; but it must be reached through the judgment of a court of law. The mortgaged property was also open to every creditor, until specially appropriated, when it became the peculiar fund of the party to whom it was transferred, and to whom it can only be made available by a sale under a decree of the court of chancery; and when thus sold, it ceases to be any longer a resource or fund for either general or special creditors, and is in fact extinguished. If it fail to satisfy the debt of the special creditor, the general liability of the mortgagor is still open to him; but as to that liability, he occupies the same position of any other creditor, and must reach it through the courts of law also.

To this view the contract fully conforms. In the second article of this contract, p. 38, in enumerating what is to be done by the company, it is said, "the said parties of the first part will also assign and deliver the several bonds and mortgages, of which a list is hereto annexed, amounting in the aggregate to $600,000 and upwards, to John Delafield, Esq., of New York, banker, in trust, but with full power to collect and sell the same, in case of need," &c. In the list of bonds and mortgages referred to, will be found that of M. Wall, stated at the amount of the bond precisely ($23,929·20). What, then, was this bond and mortgage a security for, in fact, as well as in the contemplation of the parties ? Why, undoubtedly, for $23,929·20. Was it a security for this sum then presently due ? This could only be ascertained by looking at the bond and mortgage. Doing so, it was found the obligor was unwilling to undertake to repay that sum, immediately, and that he only undertook to pay it, in five, ten, and fifteen years from the first day of January, 1839. This was his agreement ; it hath this extent, no more ; and

by his agreement only is he bound. Was the bond, thus drawn and secured by mortgage, a satisfactory security to the complainants ? From their having received it as such, there can be no contrary inference ; and they cannot now either increase the amount of the security, or diminish the time it had to run to maturity. The contract of the defendant, M. Wall, with the company, of which he was a member, as transferred to the complainants, is the measure of his liability, and of their rights ; and if it be insisted that he is liable for the whole debt, it does not thence result, that he is liable for it, under this bond and mortgage ; on the contrary, the bond and mortgage fix the precise amount of the liability of which they are the evidence, and the period of its payment. There is as much or more difference between his general liability as a member of the firm, and his special liability under the bond mortgage, as there is between an express and an implied assumpsit ; the former being limited by its terms, and the latter being only limited by the amount of the parol indebtedness.

If the complainant, Delafield, had sold these bonds and mortgages, as he might have done under the contract, what would he have sold ? Not the general liability (as to this case) of M. Wall, but his bond, due in five, ten, and fifteen years, secured by a mortgage on real estate ; and the parties, when they speak of the right to sue, could have intended nothing further.

And the complainants, when they come to ask a decree of the Court, ask for the said sum of $23,929·20, " mentioned in the condition of the said bond or writing-obligatory and the said indenture of mortgage," and yet do so, more than twelve months in advance of the maturity of the bond; can they trace their right to the bond, secured by the mortgage, and yet disregard the main feature of the instrument — the period at which the sum it secures becomes payable ? I think not, and shall so continue to think, unless my opinion is shaken by stronger reasons than my own reflections have supplied.

*George L. Potter*, for complainants.

The first objection, that all of the partners, members of the company, are not made parties to the bill, is a manifestly insufficient cause of demurrer.

It is not true, as suggested by the demurrer, that the bill states a mortgage " made by one of the defendants to a partnership consisting of more than 100 members." The mortgage is made to " the President and Directors of the Real Estate Banking Company of Hinds county," and not to the company at large.

In this State, it is " sufficient" to " declare or *complain*" against any one or more " of several copartners." How. and Hutch. 595, sec. 30. In sec. 32, at same page, the word " complainants" is used, showing that the statute applies as well to proceedings in chancery as to actions at law.

Again, the bill shows a case in which, by reason of the multiplicity of parties connected with this association, there is an utter impossibility of bringing before the court, in one suit, all of the persons in interest. The general rule, that all parties in interest must be joined, is merely a rule of convenience, to enable the Court to settle by one decree, matters that might otherwise cause a variety of suits ; and whenever an adherence to it would produce great inconvenience, or amount to a denial of justice, the Court will dispense with the rule, for the same reasons that caused its adoption. The time is long past, since a court of chancery, on a mere technicality, would deny relief in a case of manifest equity shown by a complainant. *Van Vechten* v. *Terry*, 2 John. Ch. R. 197 ; *Adair* v. *New River Co.*, 11 Ves. 443 ; *Wiser* v. *Blachley*, 1 John. Ch. R. 438 ; *Cockburn* v. *Thompson*, 16 Ves. 326 ; *Ex'rs Brashear* v. *Van Cortlandt*, 2 John. Ch. R. 247 ; *Wendell* v. *Van Rensallear*, 1 John. Ch. R. 350.

In the case made by this bill, Wall represents his equity of redemption in his original estate ; the directors, parties defendant, represent their equity of redemption in the mortgaged estate, assigned to Delafield, one of the complainants ; they also, as the officers and trustees of the company, under the articles of association, represent the interests of their copartners, as *cestuis que trust*, under the mortgage. So that the bill brings before the court Delafield, in whom is the legal estate in the mortgaged premises ; the directors, in whom is the equity of redemption under the assignment to Delafield ; and Wall, in whom is the equity of redemption under the original mortgage. Now, it was not necessary to bring in the sev-

eral members of the copartnership, because the *legal estate* in these lands was never in them ; and because the articles of association vest the entire interests of the company in the directors, as the managers and agents of the company, and give them power, as such, to create debts binding on the company. These directors may, then, properly represent the company in proceedings for the satisfaction of debts so created. *Van Vechten* v. *Terry, et als.*, 2 John. Ch. R. 197.

Again, two distinct interests are provided for in the condition of this mortgage ; that is, the interest of the copartnership, and the interest of its creditors. The former is the amount of the stock-bond, and also such debts as Wall may owe the company ; the interest of the creditors is the amount of their claims against the company. The *power* of the directors under the mortgage was this — to charge the mortgaged premises with such debts as they might contract for the company ; to discharge the lands, by a *bonâ fide* release from the claims of all subsequent creditors of the company; to vest, by an assignment of the mortgage, in any creditor of the company, a right to prior satisfaction out of the lands, not only as against subsequent creditors of the company, but also and particularly as against the company itself ; to authorize such preferred creditor to subject the lands to the payment of his debt, by a foreclosure and sale, and hold the surplus for the directors. Now, what have the directors done ? By the assignment to Delafield, they have vested in him not only the legal estate in the lands, but also a power to foreclose the mortgage, and sell the premises in the same manner as if he had been the original mortgagee. So that in fact there is no equity of redemption, under the assignment to Delafield, to be overreached by a foreclosure, and the bill might have been filed against Wall alone, to foreclose his equity of redemption under the original mortgage. The power granted by the assignment to Delafield, to foreclose and sell the premises, and from the proceeds to pay the debt of Boisgerard, " rendering the overplus, if any there should be," to the directors, is a clear authority for Delafield to proceed against Wall alone for a foreclosure and sale ; and such sale would transfer the entire mortgaged interest to a purchaser. This would be strictly within the power granted to Delafield by the direc-

tors, and they had full power so to stipulate. (Vide, Assignment, p. 45 ; Art. of Association, last clause of art. 6, p. 27, and art. 24, p. 29.)

Parties may agree to waive their equities under mortgages, or to subject them to other rules than those which usually govern a court of chancery in adjusting such equities. Mortgages with a power of sale are an instance of such waivers, and such are very like the assignment in this case to Delafield. The mortgagor may prevent a sale under the power, by filing his bill to redeem ; but the mortgagee might sell, under the power, without a foreclosure, and the mortgagor would be bound by the sale. Now, the directors have stipulated (precisely as a mortgagor might for the sale of his estate by the mortgagee), that Delafield might proceed to foreclose against Wall, and, by a judicial sale of the premises, pay the debt to Boisgerard. The directors would be bound by such sale, in the same manner as a mortgagor would be bound by a sale under the power inserted in his mortgage.

But the complainants have chosen to bring in the present directors of the company, in order that it might be fairly represented in the cause. The argument of Judge Clifton goes beyond his demurrer, and suggests that the bill does not show that these are the present directors of the company. The bill states that the directors were to hold over until their successors were duly elected (p. 4); they are named as the present officers of the company, and as such are charged as combining, &c. with Wall (p. 21) ; and as such officers, combining, &c., process is prayed against them. Judge Clifton cites *Cullen* v. *Duke* of Queensbury, 15 Ves., note to p. 14, to show that the present directors should be made parties ; but that case only shows that the directors' " contractors" need be parties. That case is reported in 1 Brown, Ch. Rep. 101, where it appears that the defendants were the former directors. The reporter, according to his custom, makes his marginal note a part of his report, and there states, — " Committee of a voluntary association, entering into agreements with tradesmen for the whole, sufficient to make them parties to a bill, and not necessary to include all the subscribers."

But suppose the objection to exist, this demurrer does not reach

it, because it is not stated as a cause of demurrer ; nor is it the subject of a demurrer ; because, the bill does not show that these directors are not the present officers of the company ; it might be good matter for a plea.   If the bill did show such a defect, the demurrer should point out the proper parties (Mitford Pl. 238, 239) ; but this demurrer merely states, that "more than one hundred" partners are not made defendants.   To reach the objection taken in the *argument*, the demurrer should aver, that the directors' defendants are not the present directors, and such a demurrer would be bad as a "speaking demurrer."

The second objection is also an insufficient cause of demurrer.

The mortgage was not given "primarily" to secure the payment of the stock-bond.   The intent is stated in the mortgage, to pledge the lands as a security for the creditors of the company, the holders of the notes, bills, checks, and other liabilities of the company (mortgage, p. 31, 32).   The lien on the lands was to be coextensive with the "general liability" of the stockholders, and the condition of the mortgage was framed accordingly.   The capital stock of every copartnership is "primarily" liable to the creditors of the firm, and the legal result of the terms of this mortgage, is, that the holders of claims against the company, shall have a priority of satisfaction out of the mortgaged premises.   This was manifestly the intent of the parties, for, by the terms of the mortgage, a creditor might subject the lands *presently* to the payment of his debt, but the company could not proceed until after the first instalment of the bond fell due, or some "call" had been made on the mortgagor.

What was the object of this association ?   Its declared purpose was banking, or, as it is expressed in the articles, to "cause a prudent expansion of the monetary issues" (Articles of Association, preamble); and provision is accordingly made "for the issues of the company" (p. 27, art. 13) ; and the amount of these "issues" was to be regulated by the value of the mortgages.   It was expressly provided (p. 29, art, 23), that the "bills, notes, &c.," of this company, should be secured by the mortgages.   The directors prescribed this form of mortgage, as they were authorized

to do (p. 26, art. 2) ; so that the insertion of the "notes, bills, &c.," in the condition of the mortgage, was simply a compliance with the letter and spirit of the articles. Independently of this general clause for the protection of creditors, a court of equity would subject these lands presently to the payment of the debts of the company, either by a sale of the entire premises as part of its assets, or by assessing the present value of the mortgage interest of the company, and decreeing a sale for that amount. It is true, as Judge Clifton argues, that this clause of the mortgage, in relation to the "notes, bills, &c." creates no additional "liability" against the mortgagor ; but it does create an additional *security* for the creditor. This clause was not inserted to limit or extend the liability of Wall as a partner, but to declare the extent and purpose of the *pledge* created by the mortgage. The demurrants admit the nullity of this objection, in the course of their argument to sustain it, thus ; "before the agreement of the 9th of March, 1839, *any creditor* of the company might have filed a bill against the proper parties, and *subjected this fund or the mortgaged premises to sale*, for the satisfaction of his debt." In such a case the creditor would not have proceeded against "the general liability of Michael Wall," neither against "bond and mortgage, and the land on which they rested ;" but against the land as being a specific pledge, set apart by the mortgage, to secure debts created by the company.

If the pledge proved deficient, resort might be had to his "general liability." It is also true, that the "bond and mortgage" were, by the agreement, to be transferred to Delafield ; "what then was this bond and mortgage a security for, in fact, as well as in the contemplation of the parties ?" The bond was no "security," it was simply a legal *obligation*, constituting a cause of, action, and altogether independent of the mortgage ; the bond was a liability against Wall, for the amount secured by it ; but Wall was subject for the whole amount due to Boisgerard, by reason of his "general liability." On the other hand, the mortgage was a "security" to the full value of the lands, and that, independent of the bond.

The "bond" is indeed embraced by the terms of the mortgage,

but it was not to be transferred as a " security " for the prompt payment of the loan ; the latter was to become due long before the first instalment of the bond.    Why then was the bond transferred with the mortgage ?    For this, that the *entire mortgaged estate* might be under the control of Delafield as trustee, for the better security of the loan ; that no third party might acquire rights under the bond ; that it might be beyond the control of the Real Estate Banking Company ; in this view the transfer of the " bond " *was* a " security."

It may be that complainants anticipated the claim now set up, by Judge Clifton, that the mortgage was given " primarily " to secure this bond ; and, to avoid the force of that objection, stipulated, that the bond should be transferred with the mortgage.    Admit it to be true, that the bond was to be first paid out of the mortgaged premises, or that it was to be paid *pro rata ;* by the transfer of the bond, complainants are subrogated and substituted, in the place of the directors and of the company, and so are entitled to prior and full satisfaction, before the directors or the company can claim any part in the premises.    If two notes are secured by mortgage, and I transfer one of them *and the mortgage* to A. as security for the payment of the other, do I not forego my claim to prior or *pro rata* satisfaction out of the premises ?

The stock bond is not for a given sum only, but for that and " any other call ; " the creation of any debt by the directors was " a call," within the terms of the bond.  (p. 36.)

These two points are the only ones discussed in the arguments for the demurrants, submitted to me, and I *have* confined myself to them, without remarking on other points presented by the bill.

*C. R. Clifton,* in reply.

The first point taken in the demurrer as to the necessity of making additional parties, appeared to be more doubtful, on examination, than at the first thought ; and as great confidence, not only undiminished but much strengthened by subsequent reflection, is entertained as to the second, it will be left for the decision of the Chancellor, without any additional remark, other than this — that the act of 1836

applies exclusively to proceedings in a court of law, and cannot be converted into an authority for altering the form and mode of proceeding in this Court. It is true, that, in strictness, the word "complainant" can only apply to a party in a suit in Chancery ; but it is better to suppose that the draftsman of the bill was not sufficiently mindful of the terms he employed, than to disregard the general scope and design of the act.

The second point has been carefully reëxamined, with all the light shed upon it by the learned counsel of the complainants, but nothing has been found to bring it into question. Indeed, it would be an affectation of courtesy, not to say that the feebleness with which it has been assailed has confirmed my opinion that it is unassailable. I will examine the arguments of the gentleman, and attempt to show that, in thus characterizing them, I do them no injustice.

The articles of association filed with the bill as Exhibit A, contain the terms and conditions of the contract, and the bond and mortgage are instruments therein provided for, and to be drawn in pursuance of these terms and conditions. I have re-read these, and can come to no other conclusion than that the "primary," if not the only, object of the bond and mortgage was, to secure the amount of the stock subscribed ; and it is difficult to perceive by what process of just reasoning a different conclusion can be reached.

The 15th article provides for the admission into the company of persons owning no real estate, upon the payment of the amount of stock subscribed for in "gold and silver," without giving any bond and mortgage. The liability of a stockholder coming in under this provision could not have been assigned to Delafield in trust for Boisgerard, under the contract with the latter, although his liability to the creditors of the company was coextensive with their indebtedness ; for the reason, that, instead of giving a bond for his stock with mortgage to secure it, he had paid gold and silver for it. The liabilities of those who had given bond and mortgage, to the extent of the bond secured by mortgage, could be transferred, not because they were responsible for all the debts of the company — for, in this respect, there was no difference between the two classes of stockholders — but because they had contracted a specific liability for a definite amount, capable of assignment. What was this specific

liability ?   The bond for the amount of the stock subscribed, se-
cured by mortgage on unincumbered real estate.    (See article 2.)
When was the bond payable, according to its terms ?   In 5, 10, and
15 years from the first day of January, 1839.    This was the con-
tract.    Had it been held by the company instead of being assigned
to the complainants, when could payment have been enforced ?   In
5, 10, and 15 years from 1st January, 1839.    Why ?   Because
such were the terms of the contract ; and no man, when he conde-
scends on a written contract, is bound further or otherwise than he
contracted to be bound.    Could the company transfer to the com-
plainants, by said assignment, a right they had not secured to them-
selves by the contract ?   They could not ; and the record fur-
nishes no evidence they have attempted to do so : if they have,
however, they have exceeded their powers, and the defendant has
a right to be protected against a construction his contract will not
bear.

   To secure the capital stock by bond and mortgage, or by payments
in gold and silver, was deemed by the company an ample guaranty
to those who might become their creditors for any liability the di-
rectors were authorized to incur ; and hence the 13th article declares,
that the issues of said company shall not never exceed the amount of
stock secured by the mortgage and the cash actually in the vaults ;
thereby intending, plainly, that the action of the directors should har-
monize with the resources they had provided for in the bonds and
mortgages, and cash payments.    The 14th article specifies when the
stock subscribed for was to be paid, and shows that it was the
expectation of the stockholders that the profits of the company
would meet these instalments as they respectively became due, and
that the bond was only to be looked to to make good any deficit
which might happen after such appropriation of the profits.    With
what propriety, then, can the statement, that the bond and mortgages
were given " primarily" to secure the stock subscribed, be contro-
verted ?

   The counsel on the other side say, " by the terms of the mort-
gage a creditor might subject the lands *presently* to the payment
of his debt ; but the company could not proceed until after the
first instalment of the bond fell due, or some ' call ' had been made

on the mortgagor." The first part of this sentence, that, "by the terms of the mortgage a creditor might subject the lands *presently* to the payment of his debt," finds no support in the mortgage itself : there is nothing in it to justify the statement. Its terms are, "if the said Michael Wall, his heirs, &c., shall well and truly pay off and discharge and satisfy the said president and directors and their successors, for the stock subscribed for by the said Michael Wall, at the times and periods when the same shall become due and payable, and well and truly pay off and discharge all the notes, bills, checks, and other liabilities of the said Real Estate Banking Company of Hinds County, then, and from thenceforth, as well this present indenture and the estate hereby granted, as the bond aforesaid, shall cease, determine," &c.

It is admitted by the complainants' counsel, in the above extract, that the *company* could not proceed until after the first instalment of the bond fell due, or some "call" had been made on the mortgagor. The terms of the mortgage show, that no right of *present* satisfaction was conferred on any class of creditors, or on any one whatever ; and the only difference between the rights of the company and those of creditors, under the mortgage, is, that the payment of the bond to the company for the stock is "primarily" provided for, but only at the "*times and periods when the same shall become due and payable.*" But if the argument of the counsel be granted, he can gain nothing by it, since he concedes that the company could not proceed until the first instalment of the bond became due ; and it is quite clear that the complainants hold under the company, and by the transfer of the bond and the mortgage made to secure it, only succeeded to the rights of the company. The company could assign no right which they did not possess, and it is admitted that *they* "could not proceed until after the first instalment of the bond fell due."

If the company had proceeded on the bond after it fell due, and had foreclosed the mortgage for the amount due on it, and sold the land, any proceeding by a creditor to subject the land afterwards must have been discharged upon its being made known that it had been already sold to pay the stock-bond ; and this shows, that the amount of the bond limits the liability of the defendant under the

mortgage, and is the measure of the extent of any right to be acquired by its transfer ; and, that whatever may be the recourse of the complainants against the defendant, or his general liability as a member of the company, when they hold under the bond and mortgage they must look to the contract which they contain for their rights, and can neither exceed it or disregard its terms.   It is not true, then, that " the lien on the lands was to be coextensive with the general liability of the stockholder, and the condition of the mortgage framed accordingly."

The counsel proceeds :  " It was expressly provided (p. 29, art. 23), that the bills, notes, &c. of this company, should be secured by the mortgages.   The directors prescribed the form of mortgage as they were authorized to do (p. 26, art. 2), so that the insertion of the ' notes, bills, &c.,' in the condition of the mortgage, was simply a compliance with the letter and spirit of the articles."   In this there is a strange misconception of the 23d article.   It only provides for the transfer of the mortgaged property and the stock which it covers, and the release from liability of the stockholder transferring, and the assumption, on the part of the person to whom the transfer of the stock and conveyance of the mortgaged premises are made, of the general liability of the company, for its notes, bills, &c., previously incurred ; but does not, by implication or inference, however remote, refer to the point in controversy.   The second article is equally misconceived.   It is not true, that it authorizes the directors to prescribe a form of the mortgage to secure the payment of the notes, bills, &c., of the company.   Its language is: "the payment of the stock, thus subscribed for, shall be secured by *bond* and *mortgage* upon unincumbered real estate, executed by the parties subscribing as above ; the *forms* of which bond and deed of mortgage shall be devised under the superintendence of the president and directors to be hereafter chosen."   Here, the sole object is to devise the *form* of the *stock-bond*, and the *form* of a *mortgage* to secure the payment of the stock-bond, and not to devise a form for embracing any other or additional liability.   This specific and definite object was to be effected by the bond and mortgage, and the articles of the company do nowhere authorize, permit, or provide, that the president and directors may include in the mortgage any other

liability than the stock-bond ; it is the " payment of the stock sub-
scribed for," that is to be secured by bond and mortgage — nothing
more : and hence both the " letter" and " spirit" of the articles are
violated in the form of the mortgage " devised by the president and
directors " ; but, even with all the advantage of this violation, the
complainants cannot disregard the leading object of the bond and
mortgage, which was to secure the payment of the amount of stock
subscribed, in 5, 10, and 15 years from the 1st day of January,
1839, by falling back upon an incidental one, and thus convert the
bond payable in 5, 10, and 15 years, and the mortgage made pre-
viously to secure it, into a security payable on demand. This
would be a monstrous perversion of the contract, and can never
receive the sanction of any judicial tribunal, until it usurps the power,
not only to disregard the contract which a party has made, but the
much more monstrous power of making a contract for him, and then
enforcing it.

The counsel continues : — " Independently of this general clause
for the protection of the creditors, a court of equity would subject
these lands presently," &c.

As to this, it may be observed, that a court of equity will not
take jurisdiction of a case, where the remedy at law is undoubted,
and that, aside from the bond and the mortgage given to secure it,
the defendant, M. Wall, occupies the same relation to these com-
plainants, that a stockholder would occupy, who had given no bond
and mortgage, but had paid the amount of his stock in " gold and
silver"; and it seems manifest, that a court of equity would not en-
tertain a bill against such an one, at the instance of these or any
other complainants, to enforce his general liability. The extent of
the " general liability" of the stockholders could not be known, at
the time the company was formed, at the adoption of the articles of
association; but the amount of stock subscribed for by each was
definite and fixed ; and as this amount was made the basis of all the
transactions of the company, the articles of association limited the
mortgage expressly to the stock subscribed. The liability grew
out of the articles of association. The mortgage could not limit,
nor did it extend, that liability ; nor could it create any new ones ;
it only provided a security to meet a specified and limited, known

and fixed part of that liability (the stock). The general liability of the stockholder being fully recognized, but unknown in extent, was never intended by the company to be provided for by the mortgage, and in fact was not so provided for.

The counsel on the other side is mistaken in saying that the demurrants admit the nullity of their objection, in taking the position that, before the agreement of the 9th of March, any creditor of the company might have filed a bill to subject the fund or mortgaged premises to sale, &c. ; because "any creditor" must be held to include those only whose debts are due, as no other could proceed to collect ; and if, so far as the bond and mortgage are concerned, these complainants are "creditors" by virtue of the assignment to them of said bond, and the mortgage made to secure it, then their debt was not, and is not due, and they are not embraced by the remark. But that remark was made in the course of an attempt to show, that the bond and mortgage, which, before the agreement of March, 1839, constituted a security to which all creditors, whose debts were due, might have recourse, was by that agreement specially appropriated, and ceased to be a fund to which all the creditors might resort. It was not intended, by that remark, to admit, that before the "9th of March," as a period of time, but before the contract of that date (the debt being due), any creditor might subject it. No omission of counsel can mature a debt, before the time fixed by the party contracting it, and such a construction of the remark in this case, is an (no doubt) unintentional, but total misconception of it.

The counsel seems to convince himself, in the progress of his argument, that his positions are untenable, and by way of saving himself from entire overthrow, falls back, in the conclusion of his argument, upon one, that stress of circumstances of uncontrollable force could alone have induced him to take. He says, "the stock bond is not for a given sum only, but for that and 'any other call ;' the creation of any debt by the directors was 'a call,' within the terms of the bond." I shall make no argument, in reply to this; but I shall refute it, by directing the attention of the Chancellor to the terms used in the bond, and the subject-matter of that article, in the articles of association, to which these terms refer.

The condition of the bond, after directing the payment of the amount for which it is drawn, in five, ten, and fifteen years, adds, " and shall meet and satisfy any other call that shall be made upon the said Michael Wall, by the said president and directors, in pursuance of the requirements of the said articles of association, at any time, then," &c.

The 7th article of the articles of association is in these words :— " For the purpose of enabling the company to commence immediate operations, the board of directors are hereby authorized and empowered to make a call of not exceeding five per centum of the amount of stock subscribed. Additional calls may be made, from time to time, at the discretion of a majority of two thirds of the directory, until the aggregate amount of such calls required shall be ten per cent. upon the amount subscribed, when all further calls shall cease," &c. The refutation of that suggestion, as to the " call," could not be more complete.

It will not be pretended by any one, that an action at law could be maintained on the bond. Nevertheless, the complainants have averred (p. 20), " that no proceedings at law have been had or instituted for the collection and recovery of the said sum of $23,-929·20, mentioned in the said bond," &c. — apparently implying a belief on the part of the pleader, that the bond was due ; and this, it seems to me, must have been the delusion under which the bill was brought, — and brought, as I think, prematurely.

CHANCELLOR.  This bill is filed to foreclose a mortgage, made by the defendant, to the President and Directors of the Real Estate Banking Company of Hinds county, and by them assigned to the complainants.  In April, 1838, the defendant, with a great number of other persons, associated themselves in partnership, for the purpose of carrying on the business of private banking in the town of Clinton, in this State.  The partnership-stock was to amount to a million of dollars, to be divided into shares of one hundred dollars each, and each partner was to give a bond, for the amount of his stock, payable in five, ten, and fifteen years, to be secured by a mortgage on unincumbered real estate.  The defendant took stock, to the amount of $23,929·20, for which he gave his bond, payable

in five, ten, and fifteen years after the 1st January, 1839, and made a mortgage, the purposes of which are stated, in the recital thereof, in these words : "And being desirous of still further securing the payment of said stock subscribed for, as aforesaid, punctually, at the times and periods prescribed in and by said bond and articles of association, and to bind and render himself, his heirs, executors, administrators, and assigns, liable, according to the tenor and effect and true intent and meaning thereof, in conjunction with each and every stockholder of the said capital stock of said Real Estate Banking Company of Hinds county, to all and singular the holders of the notes, bills, checks, and other liabilities, of the said Real Estate Banking Company of Hinds county, now existing, or which may hereafter exist, at any time during the period of fifteen years, the time prescribed in the bond and articles of association aforesaid, of said Real Estate Banking Company of Hinds county ;" and then proceeds thus : " Now, therefore, this indenture witnesseth," &c. The conditions of the deed of mortgage are thus stated : " If the said Michael Wall, his heirs, executors, or administrators, shall well and truly pay off, discharge, and satisfy the bond aforesaid, signed, sealed, and delivered by said Michael Wall, as aforesaid, and well and truly pay and satisfy the said president, directors, and their successors, as aforesaid, for the stock subscribed by the said Michael Wall, at the times and periods when the same shall become due and payable, and well and truly pay off and discharge all the notes, bills, checks, and other liabilities, of the said Real Estate Banking Company of Hinds county, then and from thenceforth, as well this present indenture, and the estate hereby granted, as the bond aforesaid, shall cease, determine, and become absolutely null and void."

In March, 1839, the company, having borrowed $300,000 from the complainants, transferred to them this and other mortgages of like character, as security for the repayment of the sum so borrowed. The defendants have demurred to the bill, and assigned two causes of demurrer. 1. It is insisted that the other partners or stockholders should all have been made parties defendant to this bill. The general rule in equity certainly is, that all persons in interest must be made parties. But the application of the rule to particular cases is always subject to the exercise of a sound discretion, and may be

modified, or partially dispensed with, as the ends of justice and the exigency of the case may require. The Court will not so apply the rule as to defeat the purposes for which it was instituted; we hence find in practice, that many exceptions and restrictions to the generality of the rule have been established. Among the most obvious of these is the case where the parties are so numerous as to render it inconvenient, if not impracticable, to bring them all before the Court, without incurring the hazard of great delay and unnecessary expense. In such case, if the Court can render complete justice between the parties before it, without directly affecting the interest of others, it may proceed at once to a decree, notwithstanding the objection for want of parties. In this case, it is alleged that there were upwards of a hundred partners or stockholders in this company; that many of them are dead, leaving numerous representatives. To require that all the stockholders, or their representatives, should be before the Court, would subject the case to interminable delay, arising from the death of parties, and other causes, incident to the multiplicity of persons concerned. Story's Eq. Pl. 104, 105. Moreover, I do not perceive that the other stockholders have any direct interest in the result of this suit. It is a proceeding *in rem*, upon the separate mortgage, made on the separate liability of this defendant. I think, then, that there is nothing in this ground of the demurrer. The next and principal ground relied on is, that the mortgage must be construed as being intended only to secure and cover the amount of the bond given for stock ; and as the first instalment under the bond had not become due, when the bill was filed, it is hence insisted that the suit was prematurely brought.

It thus becomes necessary for me to decide, what, in point of law, is the true interpretation of this mortgage. The terms of the articles of association are referred to, to show that nothing more was contemplated or required at the hands of each stockholder, than that he should give a bond and mortgage, to secure the amount of stock he had taken. That is true, but this did not necessarily prevent the company from afterwards making the mortgage sufficiently broad and comprehensive, to embrace those who might become its creditors, either by a loan of money, or by the receipt of its bills. We are apt to confuse ourselves, by calling this association a

Boisgerard, et al. *v.* Wall.

bank, and by judging of its rights, powers, and liabilities, by those rules which regulate a banking corporation. Banking, to be sure, was the purpose for which it was formed, but still it has attached to it all the incidents, powers, attributes, and liabilities of a private partnership ; it is, indeed, nothing more in fact or in law. It is true, that, to ascertain the powers, rights, and interests of partners as between themselves, you must look to the articles of partnership. But, as to third persons, these articles may be qualified, superseded, or waived, by the conduct of the partners, however positive their provisions may be ; and where they have acted contrary to, or beyond, the terms of the original articles, they will be held to have adopted such new terms, and qualifications, as may correspond with their new line of conduct. *Jackson* v. *Sedgwick*, 1 Swans. Rep. 469 ; *Const* v. *Harris*, 1 Turner & Russel, 523; Story on Part. 288. If then any change was made, as to what should be the *nature* and extent of the liabilities of each partner, and the form of security to be given therefor, the validity of that change cannot be questioned, because of its want of corformity to the original articles, provided it has been acted upon as a rule of partnership conduct ; and this brings me back to the mortgage itself. Has such change been actually made ? It is to be observed, that this mortgage is made by one of the partners, to the partnership itself, and whatever it contains, must, therefore, be presumed to have had the partnership sanction, and to be in accordance with the partnership articles and purposes.

What, then, are the purposes and conditions of the mortgage ? I have already shown, that, according to the recital of the mortgage, its purpose was to give security for the payment of the stock bond, " *and to bind and render himself liable* " to all who then were, or might become, the creditors of the company, during the period of fifteen years. It is this somewhat awkward phraseology, upon which the apparent difficulty arises. The inquiry is, in what did he " *bind and render himself liable* " to creditors ? It surely was not thought necessary, to render a partner *liable* for the partnership debts, that there should be an express covenant to that effect ; such liability would follow as a legal consequence from his partnership relation. I must presume, that something more than a recognition

of this general liability was intended by the mortgage, because that would have been idle and useless. I cannot resist the conclusion, that the intent and meaning of the phrase, " bind and render himself liable " to creditors, meant, liable on the mortgage, according to its terms. But it seems to me, that if any doubt could exist as to the meaning of the language employed in the recital of the mortgage, that doubt is removed, and the whole matter made clear, by the explict terms of the condition. That condition is, that if the mortgagor shall well and truly pay his stock bond, at such " *times* " as it becomes due and payable, " and well and truly pay off and discharge all the notes, bills, checks, and other liabilities of the said Real Estate Banking Company of Hinds county," then the mortgage deed is to become null and void. Now if the bill-holders and other creditors have no claim under the mortgage upon the mortgage property, why not cancel the mortgage so soon as the stock bond was paid off ? But this is not the only condition ; it is only to be cancelled, when all the debts of the partnership are paid ; thus showing, as I conceive, that the mortgage was intended equally for the security of the partners themselves, and of those who might become its creditors. This construction appears to me to be perfectly consonant to the ends and purposes of the association. What is its nature, and what were its objects ? It was formed for the purposes of private banking : issuing bills to circulate as money, and dealing in exchange, would of course constitute its leading business. Each individual who came into the concern, was to put something, in the shape of capital, into the common stock. Instead of complying with the ancient, and certainly the more legitimate mode of banking, by putting in so much money, they agree to adopt the more *modern usage* of substituting the promissory notes of the stockholders, payable in long instalments, as the capital stock, upon which they would operate. It was, therefore, a matter of the utmost importance to stockholders, as among themselves, that they should have some security, that this stock would be paid in ; and as the stock was only to be paid in at intervals of five, ten, and fifteen years, it was no less important, that a prompt and stable security should be created, upon the faith of which their bank notes might be readily taken by the public, and circulated as money.

The mortgage, then, in the form in which it presents itself, was contrived for the attainment of these ends ; it was made, as it purports on its face, for the double purpose of securing the payment of the stock, which each one agreed to put into the common fund ; and also to give present and available security to any one who might become the creditor of the company, either by advancing it money to bank upon, or by receiving the notes or bills it might issue.    It is no objection to a mortgage, that it is made to secure future advances, or to cover future and anticipated liabilities. *United States* v. *Hooe*, 3 Cranch, Rep. 73 ; *Hendricks* v. *Robinson*, 2 John. Ch. Rep. 283.

Let us see in what attitude the construction contended for by the defendants would place the creditors of the company.    It must be recollected, that all the partnership property consisted in these mortgages.    The company is not the owner of the lands embraced in the mortgages, but the *mere mortgagee*.    What then would be the condition of one of its creditors, who had obtained his judgment at law, as it regards the partnership property ?    He could not reach the land itself embraced in the mortgages, nor could he reach the qualified interest which the company has in them, because the interest of a mere mortgagee, before foreclosure, is in the nature of a *chose in action*, and cannot therefore be seized and sold under an execution at law.    *Jackson* v. *Willard*, 4 John Rep. 41.

Let us see if his condition would be any better in equity.    It is true, that creditors have, in equity, a *quasi lien* upon the partnership property, for the payment of their debts ; but this equity is to be worked out, through the medium of the equity of the partners themselves as against each other.    *Ex parte* Ruffin, 6 Ves. 119, 126, 127.    The creditors, then, would have no more summary remedy on the mortgages, than the partners themselves could have; they would consequently have to wait five, ten, and fifteen years, before the mortgage could be finally foreclosed as to all the instalments.    This construction would prove an attempt by the company, by means of an arrangement among themselves, to lock up the partnership property, and place it beyond the reach of their creditors, for a long series of years.    It surely was not the purpose of the company to compel any one, who might become the

Boisgerard, et al. *v.* Wall.

holder of one of their five dollar bills, payable on demand, to wait five, ten, or fifteen years for its payment, by telling him that the mortgages only required that the stock should be paid in at those intervals ; and that no other security was provided for its payment. Such an arrangement would, it seems to me, have been a fraud upon the public. But the high character of the gentlemen concerned in it, utterly forbids the idea, that any such thing was in contemplation ; and I am gratified to find, from the mortgage itself, that such an inference is fully repelled. I have dwelt longer upon this point of the demurrer, than I should have thought it necessary, but for the ingenious and earnest manner in which it has been pressed by the learned counsel for the defendant. I wished to present fully the reasons which led my mind to dissent from the conclusions, which seemed forcible and convincing to the mind of counsel.

Let the demurrer be overruled.